UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MAXIMINO RODRIGUEZ-ROBLES,<br><br>Defendant. | Case No.: 3:17-cr-00836-GPC<br><br>**ORDER DENYING DEFENDANT'S MOTION TO DISMISS**<br><br>**[ECF No. 21]** |
|---|---|

Before the Court is a motion to dismiss the indictment filed by Defendant Maximino Rodriguez-Robles. (ECF No. 21.) Defendant argues that he cannot be prosecuted for violating 8 U.S.C. § 1326 because he is a member of a Native American nation, The Kumeyaay, whose territorial lands are dissected by the United States-Mexico border.[1] For the reasons explained below, the Court DENIES the motion to dismiss.

**I.   Background**

On August 14, 2012, a criminal judgment was entered against Defendant finding

---

[1] It appears that members of this nation living in San Diego County are referred to as Kumeyaay, whereas members living in Baja California are referred to as Kumiai. (*See* ECF No. 21-9.) In his memoranda, Defendant consistently refers to himself as a member of the "Kumeyaay." In light of Defendant's usage, the Court will use the spelling chosen by Defendant, that is, "Kumeyaay." The Court's choice of spelling is not meant to indicate any substantive assertion about Defendant's membership or citizenship.

1

him guilty of violating 8 U.S.C. § 1326 and sentencing him to 41 months imprisonment. *United States v. Rodriguez-Robles*, No. 3:10-cr-2239 (S.D. Cal.), *aff'd* 534 F. App'x 628 (9th Cir. 2013).  The United States Department of Homeland Security removed Defendant from the United States on April 29, 2013.  (ECF No. 23-1, Ex. 5.)  On April 5, 2017, a grand jury returned an indictment charging Defendant with being found in the United States after having been removed, without the consent of the Attorney General or an appropriate agent, in violation of 8 U.S.C. § 1326.  (ECF No. 9.)  On November 3, 2017, Defendant filed the instant motion to dismiss.  (ECF No. 21.)

In his motion, Defendant contends that he "is a Native American Indian and member of the Kumeyaay Nation and the recognized tribe of San Jose de la Zorra." Defendant offers a copy of a card, dated June 24, 2009, which states that Defendant "is a native Indian in [the] state of Baja California Norte."  (ECF No. 23-1, Ex. 13A.)  The card is signed by a "Kumiai Tipai Wamp Representative."  (*Id.*)  It also contains a stamp stating "Kumiai Indigenous Community San Jose de la Zorra Mun. of Ensenada, BC." (*Id.*)  Defendant explains that the Kumeyaay Nation consists of tribes spanning a geographic area dissected by the United States-Mexico border, and as a result of his membership, he has an inherent right to pass and repass the United States border.

The government filed a response in opposition on November 24, 2017 (ECF No. 23), and Defendant filed a reply on December 1, 2017 (ECF No. 24).  The Court held a hearing on December 7, 2017, during which Defendant's counsel asked for additional time to obtain documents supporting the position that Defendant was legally entitled to enter the United States as a result of his Kumeyaay membership.  (ECF No. 25.)  On January 16, 2018, Defendant filed a supplemental memorandum indicating that no further evidence supporting that position could be found.  (ECF No. 27.)  The government filed a supplemental memorandum in opposition to the motion on January 22, 2018.  (ECF No. 30.)  During the hearing that followed, the Court orally denied the motion, but also indicated that it would issue a written ruling.  (ECF No. 32.)  This order constitutes that expected ruling.

## II. Discussion

Defendant argues that his membership in the Kumeyaay Nation entitles him to pass and repass the United States-Mexico border. Defense counsel admitted during the hearing, correctly, that there is no authority in the United States Code that supports this argument. Nonetheless, Defendant contends that members of the Kumeyaay Nation possess legal permission to pass and repass the United States-Mexico border as an inherent right, which "is retained until such time as Congress or Treaty expressly take it away." (ECF No. 24 at 7.) Because no statute or treaty has removed the Kumeyaay's right to pass and repass, Defendant argues, his entitlement to do so precludes prosecution for illegal reentry.

The Court disagrees. In doing so, however, the Court does not question (1) Defendant's membership in the Kumeyaay Nation, (2) the Kumeyaay Nation's historical and moral claim to lands south and north of the United States-Mexico border, or (3) the Kumeyaay's sovereign power. Nonetheless, this Court must tailor its decisions to recognized sources of law. Because Defendant cannot point to any recognized source of law that permits him, in light of his Kumeyaay membership, to pass and repass the United States border despite federal law stating the contrary, the Court cannot conclude that the federal government is barred from prosecuting Defendant for violating 8 U.S.C. § 1326.

In support of his argument that Kumeyaay members enjoy an inherent right of pass and repass, Defendant points to examples of Congress expressly "confirming" other tribes' rights to enter this country. First, Defendant points to the Jay Treaty, which permits "Indians dwelling on either side of the" United States-Canada border "freely to pass and repass by land, or inland navigation." *Akins v. Saxbe*, 380 F. Supp. 1210, 1213 (D. Me. 1974). Defendant points to *McCandless v. United States ex rel. Diabo*, 25 F.2d 71 (3d Cir. 1928), in which the court held that the War of 1812 did not abrogate the right of Canadian-born Native Americans to pass and repass under the Jay Treaty. While that court recognized that Native Americans "have an unquestionable, and heretofore

unquestioned, right to the lands they occupy, until that right shall be extinguished by a voluntary cession to our Government," it invoked that proposition merely to support its ultimate conclusion. The court explained that this right indicated that the signatories to the Jay Treaty did not intend the recognition of pass-and-repass rights to be "a temporary stipulation . . . but was in the nature of a *modus vivendi*, to be thereafter observed in the future by Canada and the United States in reference to the Indians." *Id.* at 72. With that in mind, the court concluded that the rights of Canadian-born Native Americans—third-party beneficiaries to the Jay Treaty—were not affected by subsequent hostilities between the United States and Great Britain. *Id.* at 72–73. Contrary to Defendant's position, the court in *McCandless* did not hold—or even assert—that historical or moral pass-and-repass rights supersede federal immigration law.

In *Akins*, also cited by Defendant, the court concluded that in passing 8 U.S.C. § 1359 ("Nothing in this subchapter shall be construed to affect the right of American Indians born in Canada to pass the borders of the United States . . ."), Congress intended "to preserve the aboriginal right of American Indians to move freely throughout the territories originally occupied by them on either side of the American and Canadian border, and thus, to exempt Canadian-born Indians from all immigration restrictions imposed on aliens by the Immigration and Nationality Act." 380 F. Supp. at 1219. Again, that court did not suggest that a historical passage right—which Congress, in the case of Canadian-born Native Americans, thought it necessary to *enact legislation* to protect—itself supersedes immigration law. If anything, Congress's actions indicate that moral and historical claims to passage rights notwithstanding, the political branches of our federal government—not the judiciary—are responsible for delineating how such rights interact with federal immigration law.

Defendant points to other instances in which Congress has sought to create exceptions to immigration law in an effort to protect pass-and-repass rights. In 1983, Congress enacted the Texas Band of Kickapoo Act (the "Act"), which, among other things, established an express right of members of the Texas Band of Kickapoo Indians

4

"to freely pass and repass the borders of the United States and to live and work in the United States." 25 U.S.C. § 1300b-13(d) (2015). Importantly, that provision stated that the newly clarified right to pass and repass exists "*[n]otwithstanding the Immigration and Nationality Act.*" 25 U.S.C. § 1300b-13(d). That phrase indicates that Congress thought it necessary, in creating a legally protected pass-and-repass right, to state expressly that the right superseded existing immigration law. In other words, the "notwithstanding" phrase in § 1300b-13(d) demonstrates that Congress understood that some Band members were otherwise not permitted to pass and repass the United States border under existing immigration law.

Defendant also references an unsuccessful bill introduced in 1987 that would have clarified the Tohono O'odham's right to pass and repass. (ECF No. 21-1 at 5.) According to Defendant, the bill was "pulled at the request of the Tohono O'odham Nation who viewed it as an attack on both their traditional practices and their Nation's sovereignty." (*Id.*) Again, while the Court does not question the historical and moral rights of certain Native Americans to pass and repass this country's borders, this Court cannot exempt those members from existing immigration law without a statutory (or constitutional) basis for doing so.

Defendant also points to non-statutory actions of the federal government recognizing similar historical and moral rights. But none of those authorities can be viewed as exempting Defendant from federal immigration law. Defendant cites the United Nations Declaration on the Rights of Indigenous Peoples, which states: "[i]ndigenous peoples, in particular those divided by international borders, have the right to maintain and develop contacts, relations and cooperation, including activities for spiritual, cultural, political, economic and social purposes, with their own members as well as other peoples across the borders," and that "[s]tates, in consultation and cooperation with indigenous peoples, shall take effective measures to facilitate the exercise and ensure the implementation of this right." (ECF No. 21-8 at 13.) Aside from being aspirational in nature, this declaration suggests the opposite of Defendant's

position—that is, while historical and moral rights to pass and repass may exist, to protect those rights, states must enact affirmative measures. The same applies to the presidential proclamations and executive orders Defendant cites: none identify (or create) a source of law permitting members of the Kumeyaay to pass and repass the United States border.

Finally, Defendant points to the Kumeyaay's creation of a Border Task Force that reportedly has met with United States immigration officials. According to an Associated Press article offered by Defendant, at some point United States officials agreed to give border crossing cards to Kumiai members who possessed Mexican passports. (ECF No. 21-9.) The individuals granted border crossing cards under this program were asked to use the Tecate Mexico port of entry. (ECF No. 21-9.) According to the article, "[t]he task force in San Diego County is working with U.S. authorities to secure rights for the 1,000 or so Baja Kumiai to cross the border giving them 'pass and repass' privileges." (*Id.*) While these actions bolster Defendant's argument that the Kumeyaay Nation has a historical and moral right to pass and repass, it contradicts Defendant's argument that he is legally entitled to cross the border without proper documentation. The agreement between the Kumeyaay and United States immigration officials suggests that under United States law, a Kumeyaay member may not cross into the United States unless he or she has been given a border crossing card. Defendant does not suggest that he has ever been in possession of such a card.

In the end, this Court's recognition of Defendant's right to pass and repass the borders of the United States would amount to a severe incursion on powers of the political branches of the federal government. The Court must follow the law duly enacted by them. It does not have the power—in the absence of an applicable constitutional or statutory provision—to craft the exemption Defendant seeks. While Defendant's membership in the Kumeyaay may empower him with a historical and moral claim to access this country, it does not, on its own, empower this Court with the authority to declare that immigration law does not apply to him.
//

### III. Conclusion

Defendant has offered no source of law exempting him from the prohibitions set forth in 8 U.S.C. § 1326.  As a result, the Court has no ground to dismiss the indictment against Defendant.  The motion to dismiss is DENIED.

**IT IS SO ORDERED.**

Dated: February 22, 2018

Hon. Gonzalo P. Curiel
United States District Judge